UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


UNITED STATES OF AMERICA,

               Plaintiff,            Case No.  05-80494

v.                                  District Judge Victoria A. Roberts
                                  Magistrate Judge R. Steven Whalen

ROBERT R. MAPP,

               Defendant.
_____/

## REPORT AND RECOMMENDATION

      Before the Court is Defendant Robert Mapp's Motion to Suppress Evidence seized

pursuant to a state search warrant  [Docket #13], which has been referred for a Report and

Recommendation pursuant to 28 U.S.C. §636(b)(1)(B).  The Court took testimony on August

23, 2005 and September 20, 2005.  Although there are deficiencies in the search warrant

affidavit, those parts that are valid still support a finding of probable cause; therefore, for the

reasons discussed below, I recommend that Defendant's motion be denied.

## I.   FACTUAL BACKGROUND

      On May 12, 2005, the Redford Township Police, working in conjunction with the

Drug Enforcement Administration, obtained a search warrant from a state court magistrate

authorizing the search of 988 Robinwood in the City of Detroit.  The firearms seized during

the search form the basis of the single-count indictment in this case, charging felon in

possession of firearm, 18 U.S.C. §922(g)(1).

The affidavit in support of the search warrant was sworn to by Police Officer Eric Woodall. The salient portions of the affidavit which purport to show probable cause to search 988 Robinwood are set forth in ¶¶ 2-4, as follows:[1]

2.   Your affiant is working in conjunction with other sworn law enforcement officers of Group 8 of the Detroit DEA. In August 2004, Affiant arrested an individual for possession of crack cocaine, hereinafter referred to SOI #3162. Under Miranda SOI #3162 admitted ownership of the cocaine and wanted to become a cooperating defendant facing narcotic charges. SOI #3162 states "Boo" is a B/M approximately 25-30 yoa, 5'10" and weights approximately 300 lbs. SOI #3162 states "Boo" resides on Robinwood Street possibly the second house from the corner, near I-75 service drive and drives a silver 4-door vehicle. SOI #3162 states he calls "Boo" on his cellular telephone and places an order for crack cocaine. "Boo" would have SOI #3162 come to the Robinwood address and pick up the cocaine. SOI states the phone number is (313) 414-2527. SOI #3162 has purchased cocaine from "Boo" several times in the past and has been in the Robinwood address and seen large amounts of crack cocaine. SOI #3162 states this is where "Boo" stores his narcotics.

3.   Affiant conducted an independent investigation of "Boo" and cellular telephone number (313) 414-2527. Affiant obtained subscriber information for cellular telephone number (313) 414-2527 which revealed the phone is assigned to Robert MAPP 18695 Appoline, DOB 04-05-1975. LEIN/SOS check of MAPP reveals an extensive CCH for Felony Controlled Substances. MAPP has four previous Felony Controlled Substances convictions on his CCH. The physical description on MAPP's driver's license fits the description given by SOI #3162. Affiant was in the area of 988 East Robinwood and observed a silver 4-door vehicle bearing the MI plate of ZBU101 parked in the driveway. The residence is located in the area in which SOI #3162 described. The vehicle, 2000 Buick registers to Robert MAPP at 19410 Andover Detroit MI. Affiant knows through training and experience, person(s) involved in large-scale narcotic operation often store narcotics in places other than their primary residence. MAPP currently has a suspended operator's license and Misdemeanor warrants for his arrest out of 36th District Court of Detroit. One of the warrants is for Narcotic and Drug related offenses.

_____

[1]¶¶1(A) through 1(J) of the Affidavit contain what may be characterized as boilerplate assertions regarding common practices among drug dealers.

4.      At approximately 1300 hrs on today's date, Affiant along with other officers of Group 8 which include a MSP Trooper and a Detroit Police officer, had 19410 Andover and 988 East Robinwood under constant and uninterrupted surveillance.  Officerd/agents observed the silver Buick parked alongside of 19410 Andover.  At this time, MAPP exited the residence and entered the vehicle and drove directly to 988 Robinwood. MAPP pulled in the driveway and entered the residence and exited a short time later. The behavior is consistent with narcotic trafficking.  MAPP entered the vehicle and drove the wrong way down Robinwood and then N/B on Hawthorne and eventually E/B on 7 mile.  Affiant along with S/A Boyle, driving in an unmarked police vehicle pulled alongside of MAPP and observed MAPP to be the lone occupant of the vehicle.  Affiant knows through independent investigation of MAPP that his license is suspended and has warrants for his arrest.  MAPP also was not wearing a seat belt. Affiant stopped MAPP on 7 mile without incident.  Compl asked MAPP for his license and registration for the vehicle.  MAPP handed Affiant his driver's license. Compl explained to MAPP that his license is suspended and that he currently had two warrants for his arrest.  Compl advised MAPP that he was under arrest for DWLS and the warrants.  MAPP stepped from the vehicle without incident.  At this time, Compl read MAPP his Miranda rights and took MAPP into custody.  As Compl patted MAPP down incident to arrest Compl asked MAPP if he was in possession of anything illegal, such as weapons or narcotics. MAPP stated "yeah I got some weed in my pocket." Compl recovered a knotted sandwich size baggie containing an amount of green plant material from his right coat pocket.  The marijuana was secured and later transported to RTPD where it field-tested positive as Marijuana.  Affiant asked MAPP was he lives and he stated that he lives on Robinwood Street in Detroit.  Affiant asked MAPP if there was any narcotics or weapons at 988 Robinwood.  MAPP stated that there was no narcotics at the residence but he has 2 shotguns and 1 handgun under the mattress.  MAPP was transported to RTPD for processing and lodging.  While MAPP was being processed Affiant recovered two cellular telephones from MAPP.  The phone number to one of the phones is (313) 414-2527. MAPP also had several pieces of paper with the name "Boo" on one side and telephone number (313) 414-2527 on the other.  Affiant knows through training and experience person(s) involved in the sale and delivery of narcotics often hand their phone numbers out to future clients.

At the evidentiary hearing, Officer Woodall testified consistently with his affidavit

that in August of 2004, he received information from a confidential informant (identified as

the "SOI") regarding the alleged drug trafficking activities of an individual named "Boo,"

whose description and other identifying information matched Defendant Mapp (Tr. 8-23-05,

-3-

5-8).  According to Officer Woodall, the SOI said that he bought crack cocaine from "Boo" several times at 988 Robinwood (Tr. 8-23-05, 31).  However, the SOI did not provide any information to the effect that "Boo" possessed guns (Tr. 8-23-05, 47).  Woodall testified that he had no previous experience with the SOI, whom he arrested in August of 2004 for possession of crack cocaine (Tr. 8-23-05, 16, 20). Further, Woodall testified that he did not receive any relevant information from the SOI after August of 2004, and that he did not conduct any independent investigation of the SOI's information after August of 2004, until May 12, 2005, the date the search warrant was obtained (Tr. 8-23-05, 35-36, 38).[2]

Woodall testified that on May 12, 2005, the police and task force agents conducted surveillance at both 988 Robinwood and 19410 Andover.  The officers observed no unusual pattern of activity at either Robinwood or Andover (Tr. 8-23-05, 38-43). The Defendant was observed leaving the Andover address and driving to Robinwood, where he let himself into the house, stayed a very short time, and left (Tr. 8-23-05, 7-8).  The officers effected a traffic stop after Defendant drove the wrong way down a one-way street (Tr. 8-23-05, 7-9).  The Defendant admitted to having marijuana on his person, and a bag containing approximately 29 grams of the substance was seized from him (Tr. 8-23-05, 10).[3]  Also seized were the Defendant's cell phone, which was assigned the same number Woodall obtained from the SOI, and several pieces of paper on which was written "Boo," along with the same telephone

---

[2]DEA Agent Bradley Boyle also testified that between August of 2004 and May of 2005, the SOI did not provide any additional information about the Defendant (Tr. 67-68).

[3] Defendant is not charged with unlawful possession of controlled substances.

number (Tr. 8-23-05, 12).

Officer Woodall testified that when asked where he lived, the Defendant said the Robinwood address (Tr. 8-23-05, 10-11). He said that the Defendant initially gave verbal consent for the police to search the Robinwood house, but refused to sign a consent form. Woodall also testified that when asked whether he had any drugs or guns at the Robinwood house, the Defendant replied that he had a handgun and two shotguns (Tr. 8-23-05, 10-11). At that time, Woodall knew that Defendant was a convicted felon (Tr. 8-23-05, 63).

Defendant Mapp testified at the continuation of the evidentiary hearing on September 20, 2005. He said that when he was stopped by the police on May 12, 2005, he admitted to having marijuana on his person (Tr. 9-20-05, 10). He said that Officer Woodall asked him four or five times to consent to the search of the Robinwood house The Defendant told him that he did not live there, but rather lived on Andover, and that he could not give consent to search a house that was not his (Tr. 9-20-05, 15-17, 22). He said that not only did he tell the officers that did not live at Robinwood, but he did not make any statements about having guns at the house (Tr.35-36, 37-38). At the hearing, the Defendant introduced five exhibits, automobile  title and registration documents show his address as 19410 Andover (Tr. 9-20-05, 23-30).

The Defendant testified that "Benita," the mother of his three children, lived at 988 Robinwood. He said that he visits his children approximately every other day, and, although he used to spend the night there, he no longer did so, at least not very often (Tr. 30-31). He stated that he did not keep clothes or personal items at the Robinwood house, and did not

receive mail there.  However, he said he had access to the house in order to let his children

in after school (Tr. 31-32).  He testified that he had keys to the Robinwood house, and that

he stored a non-functional Cadillac in the garage at that location, with Benita's permission

(Tr. 39, 43).

DEA Agent Bradley Boyle testified that on May 12, 2005, both the Andover and

Robinwood locations were under surveillance (Tr. 49).  He said that Defendant was seen

leaving Andover and driving to Robinwood, where he let himself into the house (Tr. 50).

Agent Boyle stated that he heard the Defendant tell Officer Woodall that he lived on

Robinwood, and that he had a shotgun and a rifle in the bedroom closet, but no drugs.

According to Boyle, the Defendant initially said nothing about a handgun, but after Woodall

stepped out of the squad car to call the state prosecutor, he said that he had a handgun under

the mattress (Tr. 53-56).

The Robinwood house was kept under surveillance while Officer Woodall went to

obtain a search warrant.  During that time, Boyle testified, Benita Dalton arrived.  Officers

stepped inside the house with her, but did not begin the search until Woodall arrived with the

search warrant.  According to Boyle, Dalton said that the Defendant lived there (Tr. 58-59).

Also, two Black males entered and left the Robinwood house before Woodall returned with

the warrant, but no further information was obtained about these individuals.  Nor was Benita

Dalton questioned about who they were (Tr. 69-71).

Agent Boyle testified that during the execution of the search warrant, two long guns

were retrieved from the bedroom closet, and a pistol, along with some documents, was under

-6-

the mattress (Tr. 59-60).[4]

## II.   ANALYSIS

### A.   Standing

The "Fourth Amendment protects people, not places." *Katz v. United States*, 389 U.S. 347, 351, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967).  A defendant who alleges that the search of a house violated his Fourth Amendment rights has the burden of showing that he had a legitimate expectation of privacy in the place that was searched, and to meet that burden must satisfy a two-pronged test: (1) he must manifest an actual, subjective expectation of privacy, and (2) that expectation is one that society is prepared to recognize as legitimate.  *United States v. Sangineto-Miranda*, 859 F.2d 1501, 1510 (6th Cir. 1988).

A person does not have to be a resident of the premises in order to have a generally recognized expectation of privacy, and hence to claim the protections of the Fourth Amendment.  In *Minnesota v. Olson*, 495 U.S. 91, 98, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990), the Supreme Court held that an overnight guest in someone else's home had a legitimate expectation of privacy, and could therefore challenge a warrantless entry into that home to execute an arrest warrant.[5]  However, in *Minnesota v. Carter*, 525 U.S. 83, 119 S.Ct. 469, 142 L.Ed.2d 373 (1998), the Court held that persons who were present in an apartment

---

[4]These documents were Defense Exhibits 1 through 5, the automobile titles and registration bearing the Defendant's name, but the Andover address (Tr. 59-60).

[5]The *Olson* Court stated that "[s]taying overnight in another's home is a longstanding social custom that serves functions recognized as valuable by society." *Id.*

not as overnight guests, but only for the commercial purpose of packaging drugs for sale, did not have a legitimate expectation of privacy. *See also United States v. Pollard*, 215 F.3d 643, 647-48 (6th Cir. 2000).

In this case, the Defendant was neither an overnight guest at the Robinwood house (at least not on the night before the search), nor was he there for strictly commercial purposes. However, although factually dissimilar to either *Carter* or *Olson*, cases from both the Sixth Circuit and the Eastern District of Michigan provide guidance as to whether this Defendant had a sufficient connection to the premises to claim the protections of the Fourth Amendment.

In *United States v. Pollard*, 215 F.3d 643 (6th Cir. 2000), two defendants, Pollard and Rodriguez, were arrested in a house that was owned by a friend of Pollard. The Sixth Circuit found that Rodriguez lacked a reasonable expectation of privacy in the premises because he had never been there before, did not know the owner or renter of the house, and had stated that "he planned to leave immediately after the cocaine sale and catch a plane back to his home state of Texas." *Id.*, 215 F.3d at 648. Pollard, on the other hand, had been friends with the lessee for about seven years, occasionally spent the night there, and was allowed to stay there even if the residents were not present. *Id*. At 647-48.

In *United States v. Heath*, 259 F.3d 522 (6th Cir. 2001), the defendant challenged a warrantless entry into an apartment rented by his cousin. The Sixth Circuit found that Heath had a legitimate expectation of privacy based on his "acceptance" into his cousin's household, the fact that he slept there occasionally, and that he had a key that gave him

-8-

"unfettered access to the apartment and the ability to exclude others." *Id*. 259 F.3d at 533. Furthermore, the Sixth Circuit noted the familial tie between Heath and his cousin, deeming it bo be "clearly a 'relationship' which pre-dates the apartment's use for illegal conduct." *Id.*

In *United States v. Delgado*, 121 F.Supp.2d 631 (E.D. Mich. 2000), the defendant challenged the search of his grandparents' house. The evidence showed that although the defendant did not reside there, his grandparents' home was open to him, and he stayed there on occasion. Finding that the defendant had a reasonable expectation of privacy, the court stated:

> "Delgado has manifested a subjective expectation of privacy in the home- - *i.e.*, in the premises that were searched. Moreover, his relationship to those premises was substantial. He was not a transient and certainly enjoyed more than the privileges of an overnight guest. The affidavit suggests that the residence was a second home for him. If society recognizes and values the privacy interest of a house guest, as the Supreme Court held in *Olson*, then it is beyond peradventure that a grandchild's refuge in the home of his grandparents 'is a long-standing social custom that serves functions recognized as valuable by society.' *Olson*, 495 U.S. at 98, 110 S.Ct. 1684." 121 F.Supp. At 639.

An important fact common to *Pollard, Heath* and *Delgado* is that the defendants' relationship to the premises was social or familial, rather than commercial, and was of long duration. Indeed, the majority in *Minnesota v. Carter* drew the distinction between social and business purposes. 525 U.S. at 90.[6]

---

[6]In his concurring opinion in *Carter*, Justice Kennedy noted that the majority's reasoning was "consistent with [his] view that almost all social guests have a legitimate expectation of privacy, and hence protection against unreasonable searches, in their host's

In the present case, too, the Defendant, although he claims no residency at the Robinwood house, clearly has a longstanding social and familial relationship to those who live there. As in *Heath, Pollard* and *Delgado*, he is not a transient. His children and the mother of his children live there, and he has in the past spent the night there. He has a key to the house, and access to it even when Ms. Dalton is not home. He regularly goes to the house to let his children in after school. He enjoys "more than the privileges of an overnight guest." *Delgado*, 121 F.Supp. At 639. Under the *Minnesota v. Olson* formulation, does a non-custodial parent's free and regular access to a house where his children live serve a function recognized as valuable by society? If the much exploited phrase "family values" has any meaning beyond empty and cynical political rhetoric, the answer must be yes, and such a parent must be accorded at least the same degree of Fourth Amendment protection as a casual overnight houseguest.

Accordingly, I find that the Defendant has standing to challenge the search warrant.

### B.    Probable Cause

In *Illinois v. Gates*, 462 U.S. 213, 238-39, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), the Supreme Court set forth the basic standard for assessing whether an affidavit establishes probable cause to issue a search warrant:

> "The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him,...there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of the reviewing court is

---

home." 525 U.S. at 99.

simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed" (internal quotation marks omitted).

*See also United States v. Davidson*, 936 F.2d 856, 859 (6th Cir. 1991); *United States v. Helton*, 314 F.3d 812, 819 (6th Cir. 2003).

A magistrate's probable cause determination "should be paid great deference by reviewing courts." *Id.*, 462 U.S. at 236. However, that deference is not absolute, and reviewing courts must ensure that the issuing magistrate did "not serve merely as a rubber stamp for the police." *United States v. Leon*, *supra,* 468 U.S. at 914, quoting *Aguilar v. Texas*, 378 U.S. 108, 111, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964). Further, reviewing courts "will not defer to a warrant based on an affidavit that does not 'provide the magistrate with a substantial basis for determining the existence of probable cause.'" *Leon,* at 915, quoting *Illinois v. Gates, supra*, 462 U.S. at 239. In assessing the issuing magistrate's probable cause determination, the reviewing court is concerned only with those facts which appear within the four corners of the affidavit. *United States v. Hatcher*, 473 F.2d 321, 324 (6th Cir. 1973); *United States v. Weaver*, 99 F.3d 1372, 1378 (6th Cir. 1998), citing *Whitely v. Warden*, 401 U.S. 560, 564-65, 91 S.Ct. 1031, 28 L.Ed.2d 306 (1971).

The affidavit in the present case purports to show probable cause regarding evidence or fruits of two different crimes, by two different allegations: (1) narcotics and narcotic related evidence, shown by the information from the SOI, and (2) firearms, shown by the Defendant's own statements at the time of his arrest that he had guns at the Robinwood

-11-

address.[7]  When coupled with the officers' knowledge that the Defendant was a previously

convicted felon, the latter information would show that evidence of 18 U.S.C. §922(g) (felon

in possession of a firearm) would be found in the house.

### 1.    Narcotics

The information from the SOI, set forth in the affidavit, was that he bought cocaine

"several times in the past" at the Robinwood house from "Boo."  The SOI provided this

information when he himself was arrested in August of 2004.  He provided no information

post-dating August of 2004, and indeed, the testimony at the evidentiary hearing confirms

that the officers had no substantial contact with the SOI in the nine months or so between

August and the date the affidavit was presented to the state court magistrate.  Thus, the most

obvious concern with the SOI's information is its staleness.

There is no bright-line test for determining when information is too outdated to

support a finding of probable cause.  That determination requires consideration of the nature

and duration of the crime, the nature of the evidence sought, and any more recent

corroboration of the older information.  *United States v. Henson*, 848 F.2d 1374, 1382 (6th

Cir. 1988), *cert. denied* 488 U.S. 1005, 109 S.Ct. 784, 102 L.Ed.2d 776 (1989).  Quoting

*United States v. Haimowitz*, 706 F.2d 1549, 1554-55 (11th Cir. 1983), the Sixth Circuit in

*Henson* noted:

"'In general, the basic criterion as to the duration of probable cause is the

---

[7]The SOI did not provide any information regarding the Defendant's possession of
guns.

inherent nature of the crime.... [I]f an affidavit recites activity indicting protracted or continuous conduct, time is of less significance.'"

It is fair to say that the sale of narcotics often tends to be a continuing commercial enterprise which may span some period of time.  However, that time frame is not indefinite, and the mere fact that an offense involves drugs does not in itself end the staleness inquiry.  As with any probable cause determination, a court must look at the totality of the circumstances, on a case-by-case basis.  *Illinois v. Gates, supra*.

In this case, we know that the SOI's information is *at least* nine months old, and possibly older.  When he was arrested in August of 2004, the SOI said that he bought drugs from Boo "several times in the past."  We do not know how far back in the past, or how many times constitutes "several."  The SOI said that he had seen "large amounts of crack cocaine" at the Robinwood address, but we do not know when he made that observation or what in his mind constitutes a "large amount."

Not only was the SOI's information nine months old, or possibly older, but there is little, if any, corroboration of facts which would show ongoing and current narcotics activity.  The scraps of paper taken from the Defendant's wallet would show that he went by the nickname "Boo" and had the same telephone number he had nine months earlier, but that information is unhelpful in determining whether he was selling or storing drugs in the Robinwood house in May of 2005.  There was no evidence of more recent surveillance showing an unusual traffic pattern at Robinwood, or of any controlled buys.  Indeed, there was apparently no surveillance at all of the Defendant or the Robinwood house until the day

-13-

the search warrant was obtained.

This affidavit simply does not contain a sufficient basis to reasonably conclude, based on the stale, nine-month old statements of the SOI, that narcotics would be found at the Robinwood address on May 12, 2005.

### 2.    Guns

On its face, the affidavit establishes probable cause to believe that evidence of 18 U.S.C. §922(g) would be found at 988 E. Robinwood on May 12, 2005.  Specifically, the officers knew that the Defendant was a previously convicted felon, and the Defendant told them both that he lived at that address, and had firearms there.  However, the Defendant testified at the evidentiary hearing that he clearly told the officers that he did *not* live at the Robinwood address, and denied telling them that he had guns there.  Thus, the issue is whether the search warrant contains false statements which should be set aside pursuant to *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978).

Both Officer Woodall and Agent Boyle testified that the Defendant admitted residing at the Robinwood house, and both stated that Defendant at first gave verbal  consent to search, but later revoked consent.  Boyle testified that the Defendant refused consent because he did not want to cause problems with his neighbors (Tr. 9-20-05, 57).  Woodall simply said that the Defendant gave verbal consent to search, but would not sign a consent form (Tr. 8-23-05, 11-12).  The Defendant testified that when he refused to give written consent, he told the officers that he could not do so because it was not his house (Tr. 18-19).

At the evidentiary hearing, the Defendant introduced five documentary exhibits

-14-

showing that he lived on Andover, not Robinwood, and the Defendant was observed leaving the Andover address on the day of the search. There were no residency documents produced indicating that he lived on Robinwood. It does appear beyond dispute that Benita Dalton lived at the Robinwood address with her and the Defendant's children. The Defendant's testimony that he did not admit living on Robinwood therefore has the ring of credibility. However, even assuming that Officer Woodall either falsely or recklessly swore in the affidavit that the Defendant admitted residency, and striking that portion of the affidavit pursuant to *Franks*, there was still probable cause to issue the search warrant.[8]

Apart from any statement the Defendant did or did not make about where he lived, the officers observed him let himself into the house, indicating that even if he did not reside there, he had free access. In the affidavit, Woodall also stated that he had seen Defendant's car parked in the driveway of the Robinwood house. In addition, both Woodall and Boyle testified that Defendant admitted to having two shotguns and a handgun, the latter being under a mattress. When the search warrant was executed, two long guns and a handgun were in fact seized, the handgun being found under a mattress, indicating that Woodall was truthful and accurate as to Defendant's statements about the guns.[9]

---

[8]Under *Franks*, the false or reckless statements in an affidavit should be set aside, and the affidavit then examined to determine "if what is left is sufficient to sustain probable cause." *Id.*, 438 U.S. 154, 171-72, n.8. *See also United States v. Jenkins*, 396 F.3d 751, 758-59 (6th Cir. 2005).

[9]An otherwise deficient probable cause finding cannot be validated based on the fact that evidence of a crime was later seized; it is the time at which the warrant is issued that is critical, and probable cause must appear within the four corners of the affidavit. *United States*

Therefore, striking any statements of questionable credibility, the state court magistrate could reasonably draw the following inferences from the remaining portions of the affidavit in making his probable cause determination: (1) the Defendant had at least one prior felony conviction; (2) the Defendant had free access to the Robinwood house, and thus there was probable cause to believe he could exercise some dominion and control over the contents of the house; (3) the Defendant stated that he had two shotguns and a handgun under the mattress at Robinwood.  Because possession of a firearm can be either actual or constructive, joint or exclusive, *United States v. Craven*, 478 F.2d 1329 (6th Cir. 1973), the affidavit, even as redacted, supplied probable cause to believe that evidence of the crime of felon in possession of a firearm would be found at 988 Robinwood.

Accordingly, Defendant's motion to suppress should be denied.

### III.   CONCLUSION

For these reasons, I recommend that Defendant's Motion to Suppress Evidence be DENIED.

Any objections to this Report and Recommendation must be filed  within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v.*

---

*v. Weaver, supra*.  Here, however, the subsequent discovery of the guns is not used to retroactively supply probable cause, but rather as a strong corroboration of Woodall's and Boyle's evidentiary hearing testimony that Defendant made the inculpatory statements recounted in the affidavit.

*Secretary of HHS,* 932 F.2d 505 (6th Cir. 1991); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Sullivan,* 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall address specifically, and in the same order raised, each issue contained within the objections.

S/R. Steven Whalen
R. STEVEN WHALEN
UNITED STATES MAGISTRATE JUDGE

Dated: January 30, 2006

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served on the attorneys and/or parties of record by electronic means or U.S. Mail on January 30, 2006.

S/Gina Wilson
Judicial Assistant